UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

| | |
|---|---|
| **TINA KELLEMS,** ) | |
|         **Plaintiff,** ) | |
| **v.** ) | |
| ) | Case No.  08-2054 |
| **COMMISSIONER OF SOCIAL SECURITY,** ) | |
| **sued as Michael J. Astrue,** ) | |
| ) | |
|         **Defendant.** ) | |

# ORDER

In June 2007, Administrative Law Judge David Thompson (hereinafter "ALJ") denied Plaintiff Tina Kellems' application for disability insurance benefits (hereinafter "DIB").  The ALJ based his decision on findings that, although Plaintiff suffers from severe impairments, she is capable of performing other jobs that exist in significant numbers in the national economy; therefore, she is not disabled within the meaning of the Social Security Act.

The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge.

In March 2008, Plaintiff filed a Complaint (#5) against Defendant Michael Astrue, the Commissioner of Social Security, seeking judicial review of the ALJ's decision to deny DIB.  In December 2008, Plaintiff filed a Motion for Summary Judgment (#28).  In March 2009, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#32).  In April 2009, Plaintiff filed a Reply (#33).  After reviewing the administrative record and the parties' memoranda, this Court **DENIES** Plaintiff's Motion for Summary Judgment **(#28)**.

## I.  Background
### A.  Procedural Background

Plaintiff applied for DIB in February 2004, alleging disability beginning November 2, 2001.  The Social Security Administration (hereinafter "SSA") denied Plaintiff's application in September 2004, and again upon reconsideration in May 2005.  Plaintiff filed a Request for

Hearing, and then testified at the hearing in April 2007.  In June 2007, the ALJ denied Plaintiff's application for DIB based on findings that Plaintiff was not disabled within the meaning of the Social Security Act and that she was capable of performing jobs available in significant numbers in the economy.

In January 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision.  Plaintiff then appealed this decision by filing a complaint in federal court pursuant to 42 U.S.C. § 405(g).  Plaintiff seeks an outright reversal.  In the alternative, she asks the Court to remand the case for reconsideration.

### B.  Plaintiff's Background

In 2001, Plaintiff saw Dr. Victoria Johnson and Dr. Randall Megeff on several occasions for joint, neck, shoulder, and low back pain and migraines.  (R. 438-62.)  In February 2001, Plaintiff underwent a total colectomy.  (R. 501.)  In March 2001, Dr. Eric Baddour gave Plaintiff a lumbar epidural steroid injection because of her low back pain, although straight leg raising was negative and his examination indicated no trigger points.  (R. 454.)  In April 2001, Plaintiff followed up with Dr. Johnson, and stated her epidural steroid injection had resolved most of her discomfort.  (R. 451.)  In June 2001, she told Dr. Megeff that she has been having suicidal ideations, but was not sure whether she would act on them.  (R. 442.)  In July 2001, Dr. Johnson noted that Plaintiff has stable hypertension, depression, fibromyalgia, restless leg syndrome, and hyperlipidemia.  (R. 440.)

Between June 26, 2001, and August 15, 2001, Dr. Sherrie Levy treated Plaintiff for severe depression and suicidal thoughts, including admission to The Pavilion on a partial hospitalization and inpatient basis.  (R. 162-247.)  Plaintiff was subsequently discharged from the Pavilion on July 31, 2001, because she lost her job and "felt unable to continue with Partial Hospital due to financial reasons."  (R. 163.)  In August 2001, Dr. Johnson noted that Plaintiff had lost her job and was having significant problems with depression.  (R. 438.)  In

November 2001, she visited Dr. Megeff because of her headaches and depression, although she denied suicidal ideations. Dr. Megeff directed her to continue with counseling at The Pavilion. (R. 434.)

In February 2002, Plaintiff began seeing Dr. Judith Lee-Sigler for chronic pain management. (R. 417.) She reported neck, low back, and hip pain as well as headaches. (R. 417.) Dr. Lee-Sigler noted that Plaintiff is a full-time student and mother, the primary care provider for her disabled husband, and she also cares for an elderly, wheelchair-bound woman. (R. 419-20.) Dr. Sigler also noted that Plaintiff was taking an exercise class and walking 3.3 miles three times per week. (R. 420.) Dr. Lee-Sigler diagnosed fibromyalgia, cervical degenerative disc disease, and low back pain with a large biomechanical component. (R. 421.)

In March 2002, Plaintiff visited Dr. Lee-Sigler because she strained her lower back helping transfer a patient from the toilet to the wheelchair. (R. 412.) Then she visited Dr. Megeff because she strained her shoulder helping the elderly woman. (R. 411.) In April 2002, Plaintiff told Dr. Lee-Sigler that her low back pain had improved. (R. 406.) Dr. Lee-Sigler noted Plaintiff has fibromyalgia and myofascial pain, and prescribed occupational therapy for bilateral epicondyles and a myofacial release protocol for her cervicalgia and myofacial pain. (R. 406.)

In May 2002, Dr. Lee-Sigler administered an injection for right forearm extensor tendinitis. (R. 398-99.) Plaintiff stated that she had to quit school, but she was still helping the elderly woman, despite the pain, because of financial need. (R. 398.) Dr. Lee-Sigler later administered trigger-point injections over Plaintiff's bilateral trapezius and rhomboids. (R. 393.)

In June 2002, Plaintiff reported her medications were not relieving her pain or headaches. (R. 391.) Plaintiff requested Hydrocodone to "have on hand," and rejected trying different medications when her doctor would not refill her Hydrocodone prescription. (R. 390-91.)

3

In July 2002, Plaintiff followed up with Dr. Lee-Sigler regarding her chronic pain syndrome. (R. 383- 85.) Dr. Lee-Sigler expressed her concern that Plaintiff was on too many medications designed to do the same thing, therefore making their use inefficient. (R. 384.) Dr. Lee-Sigler discussed what changes she thought would be beneficial, and Plaintiff agreed to wean herself off some medications. (R. 384-85.) Plaintiff also presented to the emergency department for a chronic tension headache and was given injections of Toradol, Vistaril, and Ativan. (R. 487.)

In August 2002, Plaintiff visited Dr. Megeff, complaining that the change in medications had made her miserable. (R. 379-80.) Dr. Megeff was concerned about her narcotic use, and talked to her regarding continuing to wean herself off some medications. (R. 380.) Plaintiff later called in distress, wanting to quit all medications because she was tired of taking them. (R. 378.) Dr. Megeff changed Plaintiff's medications with the ultimate goal still being to get her off of narcotics. (R. 377.)

In September 2002, Plaintiff informed Dr. Megeff that she was feeling less groggy since she had discontinued two of her medications. (R. 371.) Plaintiff stated that she is still in chronic pain, so Dr. Megeff started her on an anti-seizure medicine, Neurontin, to aid with her pain. (R. 371.) Plaintiff later visited during a fibromyalgia flare-up, and Dr. Megeff noted that she was tender to the touch everywhere on her body. (R. 369.)

In November 2002, Plaintiff consulted Dr. Lee-Sigler because she was in pain all over. (R. 361-62.) Dr. Lee-Sigler opined that she has done everything she can think of to help Plaintiff, and recommended to Dr. Megeff that Plaintiff be sent to a chronic pain center. (R. 362.) Later in the month, Plaintiff visited Dr. Lee-Sigler again wanting to know why Dr. Lee-Sigler would not treat her anymore. (R. 359.) Dr. Lee-Sigler explained that she was not comfortable with dealing with her treatment anymore, and that a chronic pain center would provide better care. (R. 359.) Plaintiff explained she has been using her husband's Darvocet and

4

asked for a prescription of her own.  Dr. Lee-Sigler gave her a prescription and then noted she will no longer see Plaintiff.  (R. 359.)

In January 2003, Plaintiff again met with Dr. Lee-Sigler.  Plaintiff had gone to the Millennium Pain Clinic in Bloomington, Illinois, and felt her pain was under better control. (R. 354.)  After Plaintiff explained that the drive to Bloomington was too long, Dr. Lee-Sigler told her that as long as a pain-management plan was in place, she would be willing to maintain the regimen.  (R. 354.)  In May 2003, Plaintiff told Dr. Lee-Sigler that she was working 50 to 60 hours per week, and was very tired.  (R. 348.)  Plaintiff stated that it felt like her shoulder was going to fall off due to the pain.  (R. 348.)  Dr. Lee-Sigler diagnosed Plaintiff with tendinitis with tenosynovitis and possible ulnar entrapment neuropathy.  (R. 349.)  In July 2003, Plaintiff canceled an occipital block because she did not have the insurance to pay for it.  (R. 342.) However, she reported that her arm felt better since she began using a splint.  (R. 342.)  In September 2003, Plaintiff reported depression, but could not change her medicine because of financial issues.  (R. 336.)  In October 2003, Dr. Lee-Sigler recommended that Plaintiff enroll in physical therapy, a fitness center, and learn mind therapy to assist her pain management. (R. 333.)  In November 2003, an MRI of the cervical spine revealed a small central protrusion at C3-C4 and minimal disc bulging at C5-C6.  (R. 329.)

In January 2004, Dr. Lee-Sigler saw Plaintiff again, noting that Plaintiff would benefit from an exercise and behavioral modification program.  (R. 319.)  Dr. Lee-Sigler also noted that she had not recommended methadone, but she would refill the methadone for a couple more months, until Plaintiff found a pain-management program.  (R. 319-20.)  After Dr. Lee-Sigler released Plaintiff from her care, Plaintiff went to Dr. Megeff for a medication check.  (R. 317-18.)  Dr. Megeff told her that he would prescribe all of her medications except for the methadone.  (R. 317-18.)

Throughout February and March 2004, Plaintiff called her doctors' offices stating that she was in pain and needed help but could not go to the Millennium Pain Clinic, and also stating that she was willing to wean herself off of methadone if something else was given to her.

(R. 311-16.) In March 2004, Plaintiff visited the emergency department for a migraine, and was sent home with enough methadone for 32 days. (R. 478.) Dr. Megeff later noted that Plaintiff's "depression is terrible, probably because she is in chronic pain," and further noted that she was very angry during that visit. (R. 310.)

In April 2004, Plaintiff followed up with Dr. Lee-Sigler's nurse practioner, Sarah Marner, who noted that Plaintiff had 45 doses of methadone left and was continuing to wean off of methadone. (R. 306.) On April 27, 2004, Plaintiff finished her methadone wean. (R. 305.) A couple of days later, Plaintiff's sister-in-law inquired about Plaintiff's treatment. (R. 304.) Plaintiff had told her sister-in-law, Marilyn Henson, that she quit methadone cold turkey, that she had been taking her husband's Avinza, and that no one would give her any more pain medications. (R. 304.) Ms. Henson further opined that Plaintiff "just wants back on her methadone." (R. 304.)

In May 2004, Plaintiff called Dr. Megeff's office crying because of her pain, and demanding to know what Dr. Megeff would do for her. (R. 302.) Plaintiff also called Dr. Lee-Sigler's office and begged for something for her pain. Dr. Lee-Sigler's office explained that Plaintiff was no longer their patient and she needed to call her primary care physician. (R. 301.) Plaintiff responded by stating that was not right and she was going to hire an attorney. (R. 301.) Plaintiff then called Dr. Megeff's office and told him that she was going to sue Dr. Lee-Sigler because she wanted methadone. (R. 302.)

Later in May 2004, Plaintiff informed Dr. Megeff that she had been to the emergency department for treatment for her severe pain, and the physician there gave her an injection of narcotic pain medication and set her up for a psychiatric referral. (R. 296.) Dr. Megeff noted that Plaintiff has not lost prescriptions and aside from seeing the emergency department that once, she did not appear to be seeking medication from other physicians, leading him to believe Plaintiff is dependent on narcotics but not addicted to them. (R. 296-97.) Dr. Megeff explained to Plaintiff that if he was going to manage her medications, she had to follow some rules, including no hostility or threats, no using her husband's medication, and only taking medication

he prescribed. He told her that if she broke the rules, he would no longer be able to treat her. (R. 297.) In June 2004, Dr. Megeff and Plaintiff executed a pain contract outlining what Plaintiff was expected to do in order to continue treatment with Dr. Megeff. (R. 289.)

In July 2004, Plaintiff underwent a consultive psychological evaluation with Dr. William Kohen. (R. 264-67.) Dr. Kohen concluded that Plaintiff has a chronic history of depression, anxiety attacks, and numerous medical issues, as well as physical pain. (R. 267.) Dr. Kohen opined that Plaintiff would have a difficult time sustaining concentration because of her physical pain and depression. (R. 267.) He diagnosed Plaintiff with major depressive disorder and panic disorder. (R. 267.)

In September 2004, Dr. Stanley Burris completed a physical residual functional capacity assessment (hereinafter "RFC") for Plaintiff. (R. 525-48.) Dr. Burris opined that Plaintiff was limited to occasionally lifting 20 pounds, frequently lifting 10 pounds, standing for six hours during an eight-hour work day, and sitting for six hours during an eight-hour work day. (R. 528.) Dr. Burris further opined that Plaintiff should never climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to noise and avoid even moderate hazards, because she has migraine headaches and is taking strong medication. (R. 529, 531.) Later in September 2004, Dr. Phyllis Brister completed a psychiatric review technique form for Plaintiff. (R. 535.) Dr. Brister opined that Plaintiff has major depression but it does not satisfy the 12.04 listing for affective disorders. (R. 538.) Dr. Brister also found that Plaintiff suffers from panic disorder, but this impairment also does not satisfy the 12.06 listing for anxiety-related disorders. (R. 540.)

In October 2004, Plaintiff visited Dr. Megeff for a biopsy of lesions beyond her right ear. (R. 277.) In November 2004, Plaintiff saw Dr. Christine Weaver for a medical genetic evaluation. (R. 273-76.) Dr. Weaver stated that Plaintiff had multiple cutaneous neurofibroma, but needed to be further evaluated for all forms of neurofibromatosis. (R. 275.)

In January 2005, Plaintiff saw Dr. Craig Neitzel, a dermatologist, and he noted that Plaintiff had skin-colored, dome-shaped papules consistent with neurofibromas. (R. 268-70.) In

March 2005, Dr. Weaver diagnosed Plaintiff with neurofibromatosis type 1. (R. 846-48.) In March 2005, Carl Hermsmeyer completed a mental RFC assessment for Plaintiff. (R. 520-24.) He found that she was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention for extended periods, work in coordination with others without being distracted by them, and get along with coworkers. (R. 523.) In May 2005, Plaintiff was admitted to the emergency department for sudden chest pain. (R. 560-62.) Plaintiff was discharged with diagnoses of coronary artery disease, chronic pain secondary to fibromyalgia, cutaneous fibromatosis type 1, and surgical menopause. (R. 560.)

In June 2005, Plaintiff presented to Dr. Megeff with a headache that was worse than normal, and he noted that chronic daily headaches of unclear etiology were normal for her. (R. 830.) In July 2005, Plaintiff was admitted to the emergency department for chest pain, and was discharged after ruling out a heart attack. (R. 579.) In October 2005, Dr. Mervat Wahba noted Plaintiff has early kyphosis, which may accompany cases of neurofibromatosis type 1. (R. 801-03.) Dr. Robert Hurford opined that Plaintiff had a very depressed affect and appeared unhealthy. (R. 797.) Dr. Megeff assessed Plaintiff to be suffering from polypharmacy. (R. 795.) In November 2005, Plaintiff successfully underwent a triple coronary artery bypass. (R. 625-54.)

In February 2006, Plaintiff was admitted to the emergency department for chest pain. She was discharged after doctors ruled out a heart attack. (R. 574.) In April 2006, Plaintiff consulted with Dr. Giuseppe Lanzino, a neurosurgeon. (R. 717-18.) Dr. Lanzino found a left paraclinoid internal carotid artery aneurysm, and recommended that she undergo a cerebral angiogram before further treatment. (R. 717-18.) Plaintiff later underwent a diagnostic angiogram and coiling of unruptured intracranial aneurysm. (R. 720-28.)

On August 17, 2006, Plaintiff tried a new physician, Dr. Nasreen Syed, because she was unhappy with Dr. Megeff.  (R. 736.)  Dr. Syed found that Plaintiff has chronic pain with issues of polypharmacy and chronic use of narcotic pain medication, migraines, coronary artery disease, hyperlipidemia, depression, and neurofibromatosis.  (R. 739-41.)  Plaintiff subsequently consulted Dr. Megeff for her pain.  (R. 734-35.)  In December 2006, Dr. Charles Davies, a neurosurgeon, wrote a letter opining that Plaintiff was disabled and not able to work.  (R. 913.)

In March 2007, Plaintiff presented to the emergency department with chest pain.  She was diagnosed with unstable angina, and underwent a cardiac catheterization and stent placement.  (R. 919-1062.)  Plaintiff again visited Dr. Davies, who noted that she suffers from migraine headaches and pseudoseizures in the setting of depression.  (R. 1056.)  In April 2007, Dr. Megeff wrote a letter for Plaintiff, opining that Plaintiff is unable to perform any work and is totally and completely disabled because of mental and physical conditions.  (R. 914.)  In April 2007, Plaintiff was hospitalized for chest pain again, and the physician noted Plaintiff was suffering from "pretty bad depression."  (R. 1068.)  In May 2007, Dr. Megeff wrote a detailed letter to the ALJ for Plaintiff, opining that Plaintiff will never be able to work and is completely and totally disabled because of her multiple medical and psychiatric problems.  (R. 1063-65.)

### C.  The Hearing Before the ALJ

In April 2007, the ALJ held a hearing at which Plaintiff, Ronald Malik, a vocational expert (hereinafter "VE"), and Albert Kellems, Plaintiff's husband and witness, testified.

Plaintiff testified that she lives in a mobile home with her husband.  (R. 1133.)  Her last job in 2001 involved answering phones at Carle Clinic.  (R. 1134, 1148.)  After Plaintiff quit working at Carle Clinic, she collected unemployment benefits for six months.  (R. 1134-38.)  In 2003, Plaintiff worked one day at Canterbury Ridge as an aide for elderly people, but quit after one shift because she could not lift the patients.  (R. 1136.)  She did not remember being denied disability in June 1997, but if she did apply it would have been because of her fibromyalgia.  (R. 1135-36.)

Plaintiff testified that she is on medications, and they do some good, but it is not enough for her. (R. 1139.) She is on Lexapro for depression, has been on it a long time, and has taken the same dose the whole time she has been on it. (R. 1139-40.) She experiences many side effects from her medications including dry mouth, drowsiness, dizziness, blurry eyes, and an inability to sleep at night. (R. 1140.)

Plaintiff testified that she is unable to lift anything because of her back problems and she cannot sit or stand for very long because her pain is too severe. She rates her pain as a 10 (on a 10-point scale) most days. She stated that she does not have any good days, but at the hearing, she rated it as a 9. (R. 1142.) The ALJ told Plaintiff that "10" indicates pain so severe that it was totally debilitating and someone had to take you to the hospital because you were in the worst pain imaginable. (R. 1142.) Plaintiff sits in a recliner all day, and she cannot do the shopping, cleaning, or cooking. She believes she can lift about two pounds, sit for about thirty minutes, and stand up for only three minutes before she has to sit down. (R. 1143-44.) She does not drive but her license is still valid. (R. 1145-46.)

When questioned by her attorney, Plaintiff testified that she still has thoughts of suicide and the Pavilion will not accept her because she does not have insurance. (R. 1146.) She has to write everything down because she cannot remember what happened the day before. (R. 1146-47.) She is uncomfortable around people and only talks to her friends on the phone. (R. 1148.)

The ALJ gave the VE a hypothetical question regarding an individual who is limited to light work, who has occasional postural limitations with no use of ropes, ladders, or scaffolds, who needs to avoid concentrated exposure to noise and hazards, and who is limited to simple routine tasks of one- or two-step instructions. (R. 1149.) The VE testified that such an individual could perform Plaintiff's past job of fast food worker. The individual could also work as a light or sedentary hand packager, a parking lot attendant, a novelty assembler, and a packaging machine tender. (R. 1150.)

The ALJ then modified the hypothetical question by further limiting the hypothetical individual to only occasional contact with the public, coworkers, and supervisors. (R. 1150.) The VE testified that those limitations would eliminate the jobs of fast food worker and parking lot attendant. (R.1150-51.) However, the individual would be able to work as a hand packager, novelty assembler, or packaging-machine tender. (R. 1151.) The ALJ then modified the hypothetical question to include the previous limitations, but limited the individual to sedentary work. (R. 1151.) The VE testified that a representative list of jobs an individual with such limitations could do includes sorter and vehicle porter. (R. 1151.) The ALJ further modified the hypothetical question to include an individual who is less than 80% productive on the job. (R. 1151.) The VE testified that this limitation would eliminate all positions. (R. 1151.)

Mr. Kellems testified that he has been married to Plaintiff for twenty-three years and that they live together in their trailer, which has four steps to the front door. (R. 1152.) He opined that Plaintiff has backed away from life, and just sits in her chair. (R. 1153.) She does not help with household chores and she cries, for no apparent reason, up to four times a week. (R. 1154.) He believes that she has thoughts of suicide even though she does not express them to him. (R. 1155.)

### D.  The ALJ's Report and Decision

The SSA defines "disabled" as the inability "to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis. 20 C.F.R. § 416.920(a)(4). If the claimant is currently employed or was previously employed during the relevant period, she is not disabled. 20 C.F.R. § 416.920(a)(4)(i). The second question is whether the claimant has a severe medical impairment that will last at least twelve months. 20 C.F.R. § 416.920(a)(4)(ii). If the claimant does not have a severe impairment, the claimant is not disabled, and the inquiry ends. *Id.* The third question is whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the Regulations. If she does, the claimant is considered disabled

11

and the inquiry ends there.  If not, between steps three and four, the Commissioner determines the claimant's residual functional capacity, that is, the work she is still able to perform despite limitations.  20 C.F.R. § 404.1545.  The fourth question is whether the claimant is able to perform her past relevant work with her current impairment.  20 C.F.R. § 416.920(a)(4)(iv).  If she can, then she is not disabled.  *Id.*  If she cannot perform her past work, the fifth and final question is whether, with her current limitations, she can perform other work which exists in significant numbers in the national economy.  20 C.F.R. § 416.920(c)(1).

The claimant bears the burden of production and persuasion at steps one through four.  Once the claimant shows she is unable to perform past work, the burden shifts to the Commissioner to show that the claimant is able to engage in some other type of substantial gainful employment.  *Campbell v. Shalala*, 988 F.2d 741, 743 (7th Cir. 1993).

Here, the ALJ found that Plaintiff has severe impairments including fibromyalgia, degenerative disc disease, depression and anxiety, neurofibromatosis, and coronary artery disease, but those impairments do not meet or medically equal any of the listed impairments.  The ALJ determined that Plaintiff has the RFC to engage in a limited light range of work with occasional postural limitations, a restriction against climbing ladders, ropes, or scaffolds, a need to avoid concentrated exposure to noise and hazards, and a mental limitation to simple, routine tasks of one- or two-step instructions.  In addition, she may have only occasional contact with the public, coworkers, and supervisors.  Based on this RFC and the VE's testimony, the ALJ determined that Plaintiff was able to perform certain jobs that exist in significant numbers in the national economy, therefore, Plaintiff was not disabled as defined by the Social Security Act.

## II.  Standard of Review

The ALJ's decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that "the findings of the commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The United States Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consol. Edison*

*Co. v. New York*, 305 U.S. 197 (1938)). Where conflicting evidence may allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for making that determination rests with the ALJ. *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). Therefore, the question before the Court is not whether a plaintiff is disabled, but whether substantial evidence in the record supports the ALJ's finding of no disability. *Id.* The Court defers to the ALJ's determinations of credibility, "so long as they find some support in the record." *Edwards v. Sullivan*, 985 F.2d 334, 338 (7th Cir. 1993).

### III. Discussion

Plaintiff argues that the ALJ erred by making an improper credibility determination, making an improper step-two finding during the five-step sequential evaluation process, and failing to give the treating physician's opinions controlling weight. Consistent with these arguments, Plaintiff contends that the ALJ's decision is not supported by substantial evidence.

### A. Credibility

Plaintiff first argues that the ALJ erred by failing to make a proper credibility finding. Specifically, Plaintiff contends the ALJ failed to (1) properly assess her use of pain medication, (2) take a longitudinal view of Plaintiff's medications, (3) consider that physicians did not question her pain, (4) assess the side effects of her medications and weight fluctuations, (5) consider that she followed doctors' orders in taking medications, or (6) discuss the fact that she is persistently on powerful medications. Plaintiff also contends the ALJ made other errors including but not limited to his mischaracterization of Plaintiff's testimony regarding Lexapro, his assessment of Plaintiff's ability to sit at the hearing, and his consideration of Plaintiff's work history.

In a recent decision, the Seventh Circuit court stated that, in reviewing a credibility determination, a court "merely examine[s] whether the ALJ's determination was reasoned and

supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2001)). "[O]nly when the ALJ's determination lacks any explanation or support . . . [will we] declare it to be patently wrong." *Id*. at 413-14.

Here, the ALJ gave several reasons why he does not find Plaintiff credible. He stated that, while Plaintiff claims she can only sit for 30 minutes at a time, she sat through the hearing for an hour straight; she was able to participate in a variety of activities, including school, work, cleaning, and exercise, that were inconsistent with her claims of ongoing severe pain at an average level of 10; and she has a history of narcotic-dependent and drug-seeking behavior. He also stated that, although Plaintiff suffers from fibromyalgia and neurofibromatosis, she had previously worked when she had fibromyalgia and the record contained no objective evidence of disabling functional limitations related to neurofibromatosis. Finally, he stated that Plaintiff did not seek treatment from mental health professionals for her depression and psychological problems and refused referrals for such treatment.

The Court notes that the fact that Plaintiff may have a history of narcotic-dependent and drug-seeking behavior does not undermine her credibility; in fact, it supports her claims of severe pain. Nevertheless, even in the absence of this reason, the ALJ provided a detailed explanation of his reasons for finding Plaintiff's claims of pain not entirely credible. As a result, the Court cannot conclude that the ALJ's credibility determination was patently wrong.

### B. Step Two of Five-Step Analysis

Plaintiff next argues that the ALJ erred at step two of the five-step sequential evaluation process when he did not consider Plaintiff's polypharmacy dependence, somatoform disorder, headaches, and cardiac impairment as severe impairments. The Seventh Circuit court has found that "step two is a threshold analysis that requires [claimant] to show only that he has *one* severe impairment." *Bradley v. Barnhart*, 175 Fed. App'x 87, 90 (7th Cir. 2006). When an ALJ fails to label an impairment as severe, but has proceeded beyond step two of the five-step analysis, he

has not committed reversible error. *See Curtis v. Astrue*, No. 3:08-cv-42-WGH-RLY, slip op. at 11 (S.D. Ind. May 18, 2009). What matters is that the ALJ must consider the effect of all of a claimant's impairments on her ability to work.

Here, the ALJ found that Plaintiff has severe impairments including fibromyalgia, degenerative disc disease, depression and anxiety, neurofibromatosis, and coronary artery disease. Accordingly, the ALJ's failure to label Plaintiff's polypharmacy dependence, somatoform disorder, headaches, and cardiac impairment as severe impairments does not constitute reversible error.

### C.  Treating Physician's Opinion

Plaintiff next argues that the ALJ erred by failing to give Dr. Megeff's opinion controlling weight. In support, she states only that the ALJ did not cite any place in the record that was inconsistent with Dr. Megeff's opinion.

Dr. Megeff wrote two letters in which he stated Plaintiff's diagnoses and opined she was "totally and completely disabled," and that she "will never be able to work." (R. 914, 1065.)

The Court notes that the ALJ is responsible for the ultimate determination of whether a claimant is disabled and he need not accept a conclusory statement by a medical source that a claimant is "disabled" or "unable to work." *See* 20 C.F.R. § 416.927 (e)(1) (stating that the Commissioner is responsible for determining whether a claimant is disabled and "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled"). In his decision, the ALJ considered Dr. Megeff's opinions and stated as follows:

> The undersigned . . . notes that his conclusions are inconsistent with the record as a whole and his own progress notes. The record reveals minimal objective findings. Dr. Megeff notes the claimant's multiple diagnoses, but does not specify how or why these conditions cause specific functional restrictions. He mentions her neurofibromatosis, but the record does not reveal any functional limitations from such. She has coronary artery disease, but no ongoing ischemia limitation (sic) her to less than light work. She has some cervical degenerative

  disc disease and fibromyalgia that is accommodated in the restriction to a limited
range of light work.  The undersigned notes that Dr. Megeff (sic) opinion appears
based mostly upon the claimant's subjective complaints of ongoing pain and her
description of inability to engage in activities.

(R. 26.)  Thus, the ALJ adequately explained his rejection of Dr. Megeff's opinions.  Based on this explanation, the Court cannot conclude that the ALJ erred by failing to accept Dr. Megeff's opinion that Plaintiff was disabled.

### D.  Substantial Evidence

  Plaintiff next argues that the ALJ's decision is not supported by substantial evidence.  Specifically, she refers to the ALJ's analysis of her mental impairments and assessment of her credibility based on her conduct at the hearing.

  Plaintiff first contends that substantial evidence does not support the ALJ's analysis of Plaintiff's mental impairments.  Specifically, Plaintiff states that the ALJ stated that Lexapro was the only medication Plaintiff had been on "the entire time" (R. 27), which Plaintiff assumed meant since her onset date.  Plaintiff contends that this statement shows a "profound failure by the ALJ to review and consider the evidence." (#29, p. 31.)  The Court disagrees.  What the ALJ actually stated was that "at the hearing, [Plaintiff] testified that she had remained on Lexapro, the same prescription for the entire time, with no changes."  (R. 27.)  This is an accurate statement of Plaintiff's testimony.  Moreover, throughout the decision, the ALJ discussed other medications Plaintiff has taken for her depression and pain.  Finally, the ALJ also considered medical records addressing Plaintiff's functional abilities.  Based on this evidence, the Court cannot conclude the ALJ erred by his reference to Plaintiff's testimony regarding Lexapro or that this statement shows the ALJ failed to consider the evidence.

  Plaintiff next contends that the ALJ erred by relying on his personal observations when assessing Plaintiff's credibility.  Specifically, Plaintiff objects to the ALJ's subjective conclusions regarding his observations of Plaintiff at the hearing.  She explains that she could not lie down at the hearing and standing would have been even more aggravating than sitting.  As a result, sitting was her only option.

When considering an ALJ's credibility determination, courts must give great deference to the ALJ's subjective conclusions because the ALJ has the ability to see and hear witnesses who testify at the hearing. *Sims v. Barnhart*, 442 F.3d 536, 537-38 (7th Cir. 2006); *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir. 1993). Furthermore, in addition to his observation regarding Plaintiff's ability to sit, the ALJ discussed a number of other reasons that he considered when assessing Plaintiff's credibility. Based on the ALJ's explanation, the Court concluded above that the ALJ's credibility assessment was not patently wrong. In light of this overall conclusion, the Court finds that, even if the ALJ drew the wrong conclusion after observing Plaintiff at the hearing (something this Court cannot assess), that error does not merit remanding the case for reconsideration.

This Court cannot replace the ALJ's findings with its own assessment of the evidence. *Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989). The Court must affirm the ALJ's decision if substantial evidence supports his findings and inferences reasonably drawn from the record, even though some evidence may also support Plaintiff's position. 42 U.S.C. § 405(g); *Pope v. Shalala*, 998 F.2d 473, 480 (7th Cir. 1993). Thus, the Court may reverse the Commissioner's decision only if the evidence "compels" reversal, not merely because the evidence supports a contrary decision. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether Plaintiff is disabled, the Court must affirm the ALJ's decision denying benefits. *Books*, 91 F.3d at 978. In this case, substantial evidence supports the ALJ's decision. Accordingly, the Court denies Plaintiff's motion for summary judgment.

### IV. Summary

For the reasons set forth above, this Court **DENIES** Plaintiff's Motion for Summary Judgment **(#28)**.

ENTER this 1st day of September, 2009.

s/ DAVID G. BERNTHAL
U.S. MAGISTRATE JUDGE
